**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SAMSUNG DISPLAY CO., LTD., | Civil Action No. 1:25-cv-00908-RDA-LRV |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| BOE TECHNOLOGY GROUP CO., LTD., MIANYANG BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., ORDOS YUANSHENG OPTOELECTRONICS CO., LTD., CHENGDU BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., CHONGQING BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., WUHAN BOE OPTOELECTRONICS TECHNOLOGY CO., LTD., and YUNNAN INVENSIGHT OPTOELECTRONICS TECHNOLOGY CO., LTD. f/k/a/ BMOT f/k/a KUNMING BOE DISPLAY TECHNOLOGY, | |
| Defendants. | |

**DEFENDANTS' UNOPPOSED MOTION TO STAY**
**PENDING ITC PROCEEDINGS**

Pursuant to 28 U.S.C. § 1659 and this Court's inherent power to control its docket,

Defendants BOE Technology Group Co., Ltd., Mianyang BOE Optoelectronics Technology Co.,

Ltd., Ordos Yuansheng Optoelectronics Co., Ltd., Chengdu BOE Optoelectronics Technology Co.,

Ltd., Chongqing BOE Optoelectronics Technology Co., Ltd., Wuhan BOE Optoelectronics

Technology Co., Ltd., and Yunnan Invensight Optoelectronics Technology Co., Ltd. f/k/a/ BMOT

f/k/a Kunming BOE Display Technology (collectively, "Defendants") respectfully move for an

Order, substantially similar to the proposed order attached hereto, staying the above-captioned

1

matter, including all currently scheduled deadlines, until the determination of the U.S. International Trade Commission ("ITC") in *In the Matter of Certain Active Matrix Organic Light-Emitting Diode Display Panels and Modules for Mobile Devices, and Components Thereof*, Inv. No. 337-TA-1351 (the "1351 Investigation") becomes final.  Defendant Mianyang BOE Optoelectronics Technology Co., Ltd. ("Mianyang BOE") is entitled to a stay of this action as of right, because it is also a respondent in the 1351 Investigation, in which Plaintiff has asserted the same patents as in this action, and because Mianyang BOE makes this request timely, within 30 days of the filing of the complaint in this action.  28 U.S.C. § 1659.  The Remaining Defendants are all affiliates of Defendant Mianyang BOE Optoelectronics Technology Co., Ltd., and are all alleged in this action to infringe the same patents as Mianyang BOE.  The Remaining Defendants therefore request that this Court exercise its inherent power and discretion to stay this action as to them, as well, in the interests of efficiency and given the absence of prejudice to any party.  Plaintiff, Samsung Display Co., Ltd. ("Samsung Display"), has advised it does not oppose this motion to stay.  Because this Motion is unopposed, Defendants waive a hearing.

## BACKGROUND

On February 3, 2023, the ITC instituted the 1351 Investigation, based on a complaint filed by Samsung Display.  Ex. 1 (4/9/25 Commission Opinion; EDIS Doc. ID 848296) at 2. Samsung Display alleged that the importation and sale of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof, infringed claims of U.S. Patent No. 9,818,803 ("the '803 patent"), U.S. Patent No. 10,854,683 ("the '683 patent"), U.S. Patent No. 7,414,599 ("the '599 patent"), and U.S. Patent No. 9,330,593 ("the '593 patent").  *Id.* at 3.  Shortly thereafter, the ITC granted Mianyang BOE's unopposed motion to intervene as a respondent in the 1351 Investigation, and also granted Samsung

Display's motion to add allegations of infringement related to U.S. Patent No. 11,594,578 ("the '578 patent"). *Id.* at 3-4.

On April 9, 2025, the ITC found no violation of section 337.[1]  *Id.* at 31.  On May 20, 2025, Samsung Display petitioned the U.S. Court of Appeals for the Federal Circuit for review of that ITC determination.  *Samsung Display Co., Ltd. v. ITC*, Fed. Cir. No. 25-1791, Dkt. 1. That appeal remains pending, and Mianyang BOE is a party to the appeal.  *Samsung Display Co., Ltd. v. ITC*, Fed. Cir. No. 25-1791, Dkt. 8, 15.

On May 28, 2025, Samsung Display filed the complaint in this action, alleging Mianyang BOE and the Remaining Defendants make and sell OLED displays that infringe the '803 Patent, the '683 Patent, the '578 Patent, the '599 Patent, and the '593 Patent.  Dkt. 1 ¶¶ 1-12.

## ARGUMENT

Defendants respectfully request that the Court stay the entirety of this matter until the determination of the 1351 Investigation becomes final.  With respect to Defendant Mianyang BOE, such a stay is required by statute, 28 U.S.C. § 1659(a).  And with respect to the Remaining Defendants, Defendants request that the Court exercise its discretion to grant a stay in the interests of judicial economy and in the absence of prejudice.  Plaintiff does not oppose either the mandatory or the discretionary stay request.

### A.        Requested Mandatory Stay as to Defendant Mianyang BOE

28 U.S.C. § 1659(a) provides that "[i]n a civil action involving parties that are also parties to a proceeding before the United States International Trade Commission under section 337 of the Tariff Act of 1930, at the request of a party to the civil action that is also a respondent

---

[1] Earlier in the proceeding, the Investigation was terminated in part as to "all asserted claims of the '683 patent and certain other asserted claims."  *Id.* at 4.

in the proceeding before the Commission, the district court shall stay, until the determination of

the Commission becomes final, proceedings in the civil action with respect to any claim that

involves the same issues involved in the proceeding before the Commission," as long as the

request is timely under §§ 1659(a)(1)-(2).

The requirements of § 1659 are satisfied.  First, Defendant Mianyang BOE is both a party

to this action and a respondent in the 1351 Investigation.  Second, the same issues concerning the

'803, '683, '578, '599, and '593 Patents are involved in both proceedings.[2]  Third, this request is

timely.  The thirty-day period under 28 U.S.C. § 1659(a) did not begin to run until May 28, 2025,

the day Plaintiff filed this civil action.

### B.        Requested Discretionary Stay as to the Remaining Defendants

This Court has the inherent power to stay proceedings with respect to the Remaining

Defendants pending the determination of the ITC investigation.  *Landis v. N. Am. Co.*, 299 U.S.

248, 254 (1936); *Procter & Gamble Co. v. Kraft Foods Glob., Inc.*, 549 F.3d 842, 848-49 (Fed.

Cir. 2008) (quoting *Landis*).  In deciding whether to grant a stay, courts perform an "exercise of

judgment, which must weigh competing interests and maintain an even balance."  *Id.*

Additionally, "[d]istrict courts typically analyze stays under a three-factor test: '(i) whether a

stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party;

(ii) whether a stay will simplify the issues in question and trial of the case; and (iii) whether

discovery is complete and whether a trial date has been set.'"  *Murata Mach. USA v. Daifuku*

_____

[2] Because the Investigation was terminated in part as to the asserted claims of the '683 Patent, in
the alternative, out of an abundance of caution, Defendants also request a discretionary stay, for
all the reasons discussed *infra* § B, with respect to Plaintiff's claim that Mianyang BOE infringes
the '683 Patent.  Additionally, the '683 Patent involves related technology to the other asserted
patents in this action and in the ITC; for example, Plaintiff alleges that "[t]he '578 Patent issued
from an application that was a continuation of the application that issued as the '683 Patent,"
Dkt. 1 ¶ 33.

*Co., Ltd.*, 830 F.3d 1357, 1361 (Fed. Cir. 2016).  But district courts may also consider any other relevant factors, such as "the burden of litigation on the court and the parties."  *Id.* at 1362. Here, every relevant factor that the Court must consider weighs in favor of a discretionary stay of these proceedings.

  ***First***, a stay would present no prejudice or tactical disadvantage to Plaintiff, as evidenced by the fact that Defendants' request is unopposed.

  ***Second***, because the ITC investigation involves the same patents as this case, a stay may simplify the issues in question and trial of the case and minimize the burden of litigation on the Court and the parties.  A stay of this action with respect to the Remaining Defendants could promote judicial economy, conserve party resources, and avoid the risk of duplicative litigation.

  ***Third***, this action is still at the very outset.  Plaintiff filed this action on May 28, 2025; Defendants have not yet responded to the complaint; and discovery has not yet opened.

  **C.**  **Requested Relief**

  Defendants therefore respectfully request a stay of this civil action in its entirety pending final resolution of the 1351 Investigation, including any and all appeals.  As set forth in Defendants' proposed order, the parties shall jointly advise the Court no more than fourteen (14) days after the determination in the 1351 Investigation becomes final.

## CONCLUSION

  For the foregoing reasons, Defendants respectfully requests that, pursuant to 28 U.S.C. § 1659 and the Court's inherent authority, the Court enter an order, substantially similar to the proposed form of order attached hereto, staying this civil action in its entirety as to all patents-in-suit and all parties until the determination in the 1351 Investigation becomes final.

Dated: June 24, 2025

**ORRICK, HERRINGTON & SUTCLIFFE LLP**

*/s/ Sten Jensen*

STEN JENSEN (BAR NO. 38197)
sjensen@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
Telephone: +1 202 339 8400
Facsimile: +1 202-339-8500

Bas de Blank (pro hac vice forthcoming)
basdeblank@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA
94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

*Attorneys for Defendants* BOE Technology Group
Co., Ltd., Mianyang BOE Optoelectronics Technology
Co., Ltd., Ordos Yuansheng Optoelectronics Co., Ltd.,
Chengdu BOE Optoelectronics Technology Co., Ltd.,
Chongqing BOE Optoelectronics Technology Co.,
Ltd., Wuhan BOE Optoelectronics Technology Co.,
Ltd., and Yunnan Invensight Optoelectronics
Technology Co., Ltd. f/k/a/ BMOT f/k/a Kunming
BOE Display Technology

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the June 24, 2025, the foregoing was filed electronically

and served on all counsel of record through the Court's CM/ECF system.


*/s/ Sten Jensen*
Sten Jensen

# EXHIBIT 1

PUBLIC VERSION

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

In the Matter of

**CERTAIN ACTIVE MATRIX ORGANIC
LIGHT-EMITTING DIODE DISPLAY
PANELS AND MODULES FOR MOBILE
DEVICES, AND COMPONENTS THEREOF**

**Investigation No. 337-TA-1351
(Remand)**

## COMMISSION OPINION

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................... 2

I.     BACKGROUND .............................................................................................................. 2

       A.     Procedural History ............................................................................................. 2

       B.     The Asserted Patents ......................................................................................... 9

       C.     The Accused Products ...................................................................................... 10

       D.     The Domestic Industry Products ..................................................................... 10

II.    COMMISSION REVIEW OF THE FINAL ID ............................................................ 11

III.   ANALYSIS OF ISSUES REVIEWED ........................................................................ 12

       A.     Statutory Authority and Commission Rule 210.12 ......................................... 12

       B.     Domestic Industry ........................................................................................... 13

IV.    CONCLUSION ............................................................................................................. 31

**PUBLIC VERSION**

## I.     INTRODUCTION

On January 16, 2025, the Commission determined to review in part the final initial

determination ("ID") issued by the presiding administrative law judge ("ALJ") on November 15,

2024.  90 Fed. Reg. 8,034-036 (Jan. 23, 2024).  On review, the Commission has determined that

there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C.

§ 1337 ("section 337"), with respect to U.S. Patent Nos. 9,818,803 ("the '803 patent");

11,594,578 ("the '578 patent"); and 7,414,599 ("the '599 patent") (collectively, "the Asserted

Patents").

In summary, the Commission affirms the ALJ's finding that the Commission has

statutory authority to investigate Complainant's alleged violations under section 337(a)(1)(B) by

Respondents.  The Commission also affirms the ID's finding that representative display panels in

the asserted domestic industry ("DI") products practice claim 21 of the '803 patent.  The

Commission further affirms with modified reasoning the ID's finding that Complainant failed to

satisfy the domestic industry requirement under section 337(a)(3)(A) and (B).  Based on this

dispositive finding, the Commission has determined to take no position on whether the asserted

DI products also practice claim 5 of the '803 patent and whether Respondents forfeited their

argument that Complainant is not the owner of the Asserted Patents under Commission Rule

210.12(a)(7).  This opinion sets forth the Commission's reasoning in support of that

determination.

## I.     BACKGROUND

### A.     Procedural History

The Commission instituted this investigation on February 3, 2023, based on a complaint

filed by Samsung Display Co., Ltd. ("SDC" or "Complainant") of the Republic of Korea.  88

Fed. Reg. 7,463-64 (Feb. 3, 2023).  The complaint, as supplemented, alleged violations of

PUBLIC VERSION

section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain active matrix organic light-emitting diode display panels and modules for mobile devices, and components thereof by reason of infringement of claims 1-5 and 19-21 of the '803 patent; claims 1, 2, 4-10, and 13 of U.S. Patent No. 10,854,683 ("the '683 patent"); claims 1-18 of the '599 patent; and claims 1-3, 6-8, and 14-22 of the '593 patent. *Id*. The complaint further alleged that a domestic industry exists. *Id*. The notice of investigation named the following parties as respondents: Injured Gadgets, LLC ("Injured Gadgets") of Norcross, Georgia; Wholesale Gadget Parts, Inc. ("Wholesale Gadget Parts") of Bixby, Oklahoma; Phone LCD Parts LLC and Parts4LCD (collectively, "Phone LCD Parts") of Wayne, New Jersey; Apt-Ability LLC d/b/a MobileSentrix of Chantilly, Virginia; Mobile Defenders, LLC of Caledonia, Michigan; Group Vertical, LLC ("Group Vertical") of Grand Rapids, Michigan; Electronics Universe, Inc. d/b/a Fixez.com and Electronics Universe, Inc. d/b/a Repairs Universe, Inc. ("Electronics Universe") of Las Vegas, Nevada; LCTech International Inc. d/b/a SEGMobile.com ("LCTech") of City of Industry, California; Sourcely Plus, LLC ("Sourcely Plus") of Tempe, Arizona; eTech Parts Plus LLC ("eTech Parts Plus") of Southlake, Texas; Parts4Cells Inc. ("Parts4Cells") of Houston, Texas; Captain Mobile Parts, Inc. ("Captain Mobile Parts") of Dallas, Texas; DFW Imports LLC d/b/a DFW Cellphone and Parts ("DFW Imports") of Dallas, Texas; Mengtor Inc. ("Mengtor") of El Monte, California; and Gadgetfix Corp. ("Gadgetfix") of Irvine, California. *Id*. The notice of investigation also named the Office of Unfair Import Investigations ("OUII") as a party. *Id*.

On March 22, 2023, the Commission granted Mianyang BOE Optoelectronics Technology Co., Ltd.'s ("BOE") unopposed motion to intervene as a respondent in this investigation. Order No. 7 (Mar. 15, 2023), *unreviewed by* Comm'n Notice (Mar. 22, 2023).

**PUBLIC VERSION**

Two respondents, Apt-Ability LLC d/b/a MobileSentrix and Mobile Defenders, LLC, were terminated based on a consent order. Order No. 43 (Dec. 20, 2023), *unreviewed by* Comm'n Notice (Apr. 18, 2024). Ten respondents, Captain Mobile Parts, Group Vertical, Sourcely Plus, Mengtor, Electronics Universe, LCTech, Parts4Cells, DFW Imports, Gadgetfix, and eTech Parts Plus (collectively, "the Defaulted Respondents"), were found in default. Order No. 16 (May 10, 2023), *unreviewed by* Comm'n Notice (June 7, 2023); Order No. 22 (Jun. 27, 2023), *unreviewed by* Comm'n Notice (July 20, 2023); Order No. 25 (Jul. 19, 2023), *unreviewed by* Comm'n Notice (Aug. 18, 2023); Order No. 27 (Aug. 8, 2023), *unreviewed by* Comm'n Notice (Aug. 30, 2023). Accordingly, respondents Injured Gadgets, Wholesale Gadget Parts, and Phone LCD Parts (collectively, "the BLF Respondents") and BOE remain active in the investigation.

On April 20, 2023, the Commission granted SDC's motion for leave to amend the complaint and notice of investigation to add allegations of infringement related to claims 1-6, 10, 12, 17, 19, 21-23, 40-47, and 51-52 of the '578 patent. Order No. 8 (Mar. 28, 2023), *unreviewed by* Comm'n Notice (Apr. 20, 2023). When the final ID issued, only claims 5 and 21 of the '803 patent, claims 5, 10, 17, 40-41, and 47 of the '578 patent, claims 2-3, 13, and 15-16 of the '599 patent, and claim 6 of the '593 patent remained in the investigation as a result of the termination of all asserted claims of the '683 patent and certain other asserted claims. *See* Order No. 34 (Oct. 26, 2023), *unreviewed by* Comm'n Notice (Nov. 27, 2024), Order No. 39 (Dec. 7, 2023), *unreviewed by* Comm'n Notice (Jan. 8, 2024), Order No. 51 (Jun. 14, 2024), *unreviewed by* Comm'n Notice (Jul. 3, 2024), Order No. 65 (Aug. 27, 2024), *unreviewed by* Comm'n Notice (Sept. 26, 2024).

PUBLIC VERSION

On November 15, 2023, the BLF Respondents and BOE (collectively, "Respondents") moved for summary determination that SDC lacked standing to bring and maintain this investigation. Respondents argued that because SDC's parent company, Samsung Electronics Co., Ltd. ("SEC"),[1] "has an unfettered right to grant licenses, SDC lacks the exclusionary rights necessary to prove standing." Mem. In Support of Respondents' Motion for Summary Determination of Lack of Standing ("Resp. Mem. Lack of Standing"), EDIS Doc. ID 808708 at 18 (Nov. 15, 2023). Finding that "there is no genuine issue of material fact that SEC has an unrestricted right to sublicense the Asserted Patents to others" and that SEC's possession of such a right divested SDC of exclusionary rights, on January 9, 2024, the ALJ granted Respondents' motion for summary determination of no violation due to lack of standing. Order No. 44 at 13, 24-25 (Jan. 9, 2024).

On April 24, 2024, the Commission vacated that initial determination and remanded the investigation for further proceedings consistent with its opinion. In its opinion, the Commission found that "(1) constitutional standing, the Article III requirements of the Constitution related to the authority of federal courts to adjudicate lawsuits, is not required at [the] Commission; and (2) there are genuine issues of material facts relating to [Complainant's] rights in the asserted patents." Comm'n Op. at 2. The Commission remanded the investigation to the ALJ to "conduct further proceedings as appropriate and consistent with the Commission's opinion herewith." *Id.*

On May 2, 2024, the ALJ held a case management conference to discuss how the case would proceed on remand. Respondent BOE indicated that it wished to argue that SDC lacked "all substantial rights" to the asserted patents when it filed its complaint and that it wished to

---

[1] SEC owns approximately 85% of SDC. Tr. (Kim) at 567:4-16.

5

PUBLIC VERSION

pursue discovery from SEC on this issue.  Order No. 50 at 3 (June 11, 2024).  SDC responded

that a statutory cause of action defense had never previously been raised and thus was waived.

*Id.* at 5.  OUII noted that "Respondents' argument that [SDC] may not have owned the asserted

patents when it filed the complaint because it did not hold all substantial rights is fundamentally

different from the argument advanced in Respondents' motion for summary determination."  *Id.*

The ALJ then ordered "additional briefing" on "the effect of the Commission opinion on th[e]

Investigation." Order No. 47, EDIS Doc. ID 820416, at 1 (May 3, 2024).

Following a teleconference and briefing on remand, the ALJ found that Respondents

waived[2] their argument that SDC lacked "all substantial rights" to the Asserted Patents and thus

failed to satisfy the requirement of Commission Rule 210.12(a)(7) because Respondents did not

address this issue in their prehearing brief,[3] as required by the ALJ's Ground Rules.  ID at 4

(citing Order No. 50 at 4).   Specifically, the ALJ found that Respondents' prehearing brief

affirmatively raised the issue of constitutional standing, but it did not raise any argument that

Complainant SDC lacked a statutory cause of action under the Commission's Rules.  Order No.

50 at 6.  The ALJ further noted that SDC "still must meet its burden to establish that the

requirements of Commission Rule 210.12 have been met" and "this issue will be addressed at the

evidentiary hearing." *Id.* at 8 & n.8.

The evidentiary hearing was held on July 8-9, 2024, and July 15-17, 2024.

---

[2] While the ALJ used the word "waived" in Order No. 50, we understand the ALJ to have been referring to the doctrine of forfeiture.  *See In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020).

[3] *See* Respondents' Corrected Joint Pre-Trial Brief, EDIS Doc. ID 810248 at Ex. A (Dec. 12, 2023) ("RPreHB").

PUBLIC VERSION

On November 15, 2024, the ALJ issued his final ID, finding no violation of section 337 because SDC failed to show the existence of a domestic industry, among other reasons.  In particular, the ID found:  (1) the Commission has statutory authority to investigate SDC's complaint (2) SDC met its burden under Rule 210.12(a)(7); (3) SDC failed to satisfy the economic prong of the domestic industry requirement for all asserted patents; (4) SDC satisfied the technical prong of the domestic industry requirement for the '803, the '578, and the '599 patents but not for the '593 patent; (5) at least one representative accused product infringes claims 5 and 21 of the '803 patent, claims 5, 10, 17, 40-41, and 47 of the '578 patent, claims 15-16 of the '599 patent, and claim 6 of the '593 patent but not claims 2-3 and 13 of the '599 patent; and (6) the claims have not been shown to be invalid.

On November 29, 2024, Complainant SDC filed a petition for review of the ID challenging certain findings related to the '803, the '578, and the '599 patents, including the economic prong of the domestic industry requirement.[4]  SDC did not petition for review of the ID's findings related to the '593 patent.  That same day, Respondent BOE and the BLF Respondents filed a joint contingent petition for review, including the ALJ's finding that "Respondents have waived any argument that Complainant lacks the ability to bring this investigation under Commission Rule 210.12."  RPet at 11 (quoting Order No. 50 at 6).[5]  OUII

---

[4] *See* Complainant's Petition for Review of Final Initial Determination, EDIS DOC ID 838286 (Nov. 29, 2024) ("CPet").

[5] *See* Respondents Mianyang BOE Optoelectronics Technology Co., Ltd., Injured Gadgets, LLC, Phone LCD Parts LLC, and Wholesale Gadget Parts, Inc.'s Contingent Petition for Review of the Final Initial Determination on Violation of Section 337, EDIS DOC ID 838292 (Nov. 29, 2024) ("RPet").

PUBLIC VERSION

did not file a petition for review.  On December 9, 2024, Complainant, Respondents, and OUII each filed a response to the petitions.[6]

The Commission solicited submissions from the public on the public interest issues raised by the recommended determination.  *See* 89 Fed. Reg. 92721 (Nov. 22, 2024).  The Commission received comments from Representative John Moolenaar, Chairman of the House Select Committee on China, EDIS Doc ID 839550, and Dr. Robert D. Atkinson of the Information Technology & Innovation Foundation ("ITIF"), EDIS Doc ID 839549.

On January 8, 2025, SDC filed a notice of supplemental authority to apprise the Commission of the Patent Trial and Appeal Board's final written decisions in *inter partes* review proceedings on the '578 patent and the '803 patent.  In the final written decisions, the Board found claim 21 of the '803 patent unpatentable and all other asserted claims of the '578 and '803 patents at issue in this investigation had not been proven unpatentable.  *See Mianyang BOE Optoelectronics Tech. Co., Ltd. v. Samsung Display Co., Ltd.*, IPR2023-00987, Final Written Decision (Jan. 6, 2025); *Mianyang BOE Optoelectronics Tech. Co., Ltd. v. Samsung Display Co., Ltd.*, IPR2023-01075, Final Written Decision (Jan. 6, 2025).

On January 16, 2025, the Commission determined to review the final ID in part. Specifically, the Commission determined to review:  (1) the ID's findings that the Commission has statutory authority to investigate Complainant SDC's alleged violation under section 337 and that Respondents waived their argument that SDC lacked the ability to bring this investigation

---

[6] *See* Office of Unfair Import Investigations' Combined Response, EDIS DOC ID 838848 (Dec. 9, 2024) ("OResp"); Respondents Mianyang BOE Optoelectronics Technology Co., Ltd., Injured Gadgets, LLC, Phone LCD Parts LLC, and Wholesale Gadget Parts, Inc.'s Opposition to Complainant's Petition for Review, EDIS DOC ID 838869 (Dec. 9, 2024) ("RResp"); Complainant's Response to Respondents' Contingent Petition for Review of Final Initial Determination, EDIS DOC ID 838863 (Dec. 9, 2024).

under Commission Rule 210.12; (2) the ID's findings related to the technical prong for the '803

patent; and (3) the ID's findings regarding the economic prong of the domestic industry

requirement.  90 Fed. Reg. 8,034-036 (Jan. 23, 2024).  The Commission determined not to

review any other findings presented in the final ID, including the ID's finding of no violation of

section 337 with respect to the '593 patent.  *Id.* at 8,036.  Accordingly, only the '803 patent, the

'578 patent, and the '599 patent remain in the investigation.

The Commission requested written submissions from the parties on the issues under

review and submissions from the parties, interested government agencies, and interested persons

on the issues of remedy, the public interest, and bonding.  *Id.*  The parties filed their initial

submissions on January 30, 2025,[7] and their response submissions on February 6, 2025.[8]

## B.    The Asserted Patents

The technology at issue in this investigation relates to an organic light emitting diode

("OLED") display.  The '578 patent and the '803 patent are directed to a pixel arrangement

---

[7]  Response of the Office of Unfair Import Investigations to the Commission's Request
for Written Submissions on the Issues Under Review and on Remedy, Bonding, and the Public
Interest, EDIS Doc ID 842305 (Jan. 30, 2025); Complainant's Opening Submission in Response
to the Commission's Questions on Review, EDIS Doc ID 842300 (Jan. 30, 2025); Respondents
Mianyang Boe Optoelectronics Co., Ltd., Injured Gadgets, LLC, Phone Lcd Parts LLC, and
Wholesale Gadget Parts, Inc.'s Submission in Response to the Notice of a Commission
Determination to Review in Part a Final Initial Determination Finding No Violation of Section
337; Request for Written Submissions on the Issues Under Review and on Remedy, the Public
Interest, and Bonding, EDIS Doc ID 842302 (Jan. 30, 2025).

[8]  Office of Unfair Import Investigations' Reply to the Private Parties' Written
Submissions on the Issues Under Review and on Remedy, Bonding, and the Public Interest,
EDIS Doc ID 842830 (Feb. 6, 2025); Complainant's Reply Submission in Response to the
Commission's Questions on Review, EDIS Doc ID 842826 (Feb. 6, 2025); Respondents
Mianyang Boe Optoelectronics Co., Ltd., Injured Gadgets, LLC, Phone Lcd Parts LLC, and
Wholesale Gadget Parts, Inc.'s Reply Submission in Response to the Notice of a Commission
Determination to Review in Part a Final Initial Determination Finding No Violation of Section
337; Request for Written Submissions on the Issues Under Review and on Remedy, the Public
Interest, and Bonding, EDIS Doc ID 842817 (Feb. 6, 2025).

structure of an OLED display for displaying images by emitting light through a plurality of pixels. JX-3 ('803 patent) at 1:20; JX-5 ('578 patent) at 1:27. The '599 patent is directed to a pixel circuit in an OLED display "capable of detecting and self-compensating threshold voltage deviations." JX-1 ('599 patent) at 3:44-47.

### C.    The Accused Products

Pursuant to Commission Rule 210.10(b)(1), 19 C.F.R. § 210.10(b)(1), the plain language description of the accused products or category of accused products, which defines the scope of the investigation, is "active matrix organic light-emitting diode ('AMOLED') display panels and modules used as replacement displays for mobile devices comprising organic pixel elements for presenting information to a viewer which infringe one or more claims of the Asserted Patents, and components thereof, where AMOLED display modules refers to the assembly of an AMOLED display panel (containing light-emitting materials, pixel circuitry, and encapsulation layers on a substrate) with additional components such as a connector cable, one or more polarizing layers, window glass, and/or housing materials around the AMOLED display panel." 88 Fed. Reg. 7,463.

The accused products for Respondent BOE, the BLF Respondents, and the Defaulted Respondents are identified in the final ID. ID at 8-11. BOE's seven redesigned products were also adjudicated in the investigation. *Id.* at 13.

### D.    The Domestic Industry Products

Complainant SDC alleges two types of products are "articles protected by the patent": (1) certain AMOLED display modules manufactured abroad by SDC ("AMOLED DI Products") that incorporate the patented display panel; and (2) certain Galaxy smartphones manufactured abroad by non-party SEC that incorporate the AMOLED DI Products ("Galaxy DI Products"). *Id.* at 17, 157 & n.49, 168-69.

PUBLIC VERSION

SDC manufactures AMOLED display panels in South Korea and assembles them into AMOLED display modules in Vietnam and China. *Id.* at 168-69 (citing CX-1636C-NCTPSC (Pyon)[9] at Q/A 13). SDC then sells the AMOLED DI Products to SEC, who incorporates them into the Galaxy DI Products in Vietnam. *Id.* at 161, 169 (citing Tr. (Kim) at 574:23-575:5). Each AMOLED DI Product is configured for certain Galaxy DI Products. SEC then sells the Galaxy DI Products to its wholly owned U.S. subsidiary, Samsung Electronics America ("SEA"), for importation into the United States. *Id.* at 161, 170.[10] SEC also sells the AMOLED DI Products to SEA for resale to repair shops as replacement displays in the United States. *Id.* at 161. SEA engages in domestic activities relating to the Galaxy DI Products, namely activities that fall into ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████. *Id.* at 166-67.

## II.    COMMISSION REVIEW OF THE FINAL ID

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Electronic Stud Finders, Metal Detectors and Electrical Scanners*, Inv. No. 337-TA-1221, Comm'n Op. at 9 (Feb. 15, 2022) (citations omitted), *aff'd, Zircon Corp. v. Int'l Trade Comm'n*, 101 F.4th 817 (Fed. Cir. 2024). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Electronic Devices, Including Streaming Players, Televisions, Set Top Boxes, Remote Controllers, and Components Thereof*,

---

[9] Mr. Chang-Soon Pyon is "the Group Leader of the Layout Design Group in the Design Team at SDC's Mobile Display Development Center." CX-1636C-NCTPSC at Q/A 5.

[10] The ID mistakenly stated that "SEC, in turn, sells the products to SEC." ID at 170. This sentence is corrected to state that SEC sells the products to SEA. *Id.* at 161.

Inv. No. 337-TA-1200, Comm'n Op. at 7 (Nov. 10, 2021) (citations omitted), *aff'd, Roku, Inc. v. Int'l Trade Comm'n*, 90 F.4th 1367 (Fed. Cir. 2024). With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

## III.    ANALYSIS OF ISSUES REVIEWED

The Commission's findings, conclusions, and supporting analysis follow. The Commission affirms and adopts the ID's findings, conclusions, and supporting analysis that are not inconsistent with the Commission's opinion.

### A.    Statutory Authority and Commission Rule 210.12

On review, the Commission has determined to affirm the ALJ's finding that the Commission has statutory authority to investigate Respondents' alleged violations under section 337(a)(1)(B) based on the allegations in the complaint, including that Respondents have imported infringing articles and that a domestic industry exists. ID at 18-19.

Respondents appear to have argued before the ALJ that the Commission lacks authority to investigate SDC's complaint based on Respondents' assertion that SDC is not the owner of the patents. *See* Respondents' Submission in Response to Order No. 47 at 5, 7-10 (EDIS Doc ID 821216). Setting aside whether Respondents timely raised this argument, Respondents misapprehend the Commissions' statutory authority to investigate. The Commission has statutory authority to investigate based on the appropriately plead complaint filed by SDC, who alleges *inter alia* that it owns the patent.

PUBLIC VERSION

As discussed below (*infra*), the Commission's determination that Complainant SDC failed to satisfy the economic prong of the domestic industry requirement is sufficient to find that SDC has failed to prove a violation of section 337. Based on the dispositive nature of this finding, the Commission has determined to take no position on whether the ALJ abused his discretion in finding that Respondents forfeited their argument that SDC is not the owner of the Asserted Patents under Commission Rule 210.12. ID at 4, 19-20; *Beloit Corp.*, 742 F.2d at 1423.

### B.    Domestic Industry

When a section 337 investigation is based on allegations of patent infringement, the complainant must show that "an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). "[A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent . . . concerned –

> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing."

19 U.S.C. § 1337(a)(3). The "domestic industry requirement" of section 337 consists of a so-called "technical prong" and a so-called "economic prong." *Philip Morris Products S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1341 (Fed. Cir. 2023). Here, the Commission affirms the ID's finding that representative AMOLED display panels, which are incorporated into display modules, that are used in the ███████████████████████████████ products

**PUBLIC VERSION**

practice claim 21 of the '803 patent.  ID at 59-61 (citing CX-1628-NCT-PSC (Kymissis) at Q/A 592-600, 610-611, 661-669-676, 679-681).[11]

Complainant SDC asserted a domestic industry exists under prongs (A) and (B) of section 337(a)(3).  Before the ALJ, SDC relied on investments in two categories of alleged DI Products: (1) the AMOLED DI Products, which are display modules manufactured abroad by SDC that incorporate the patented display panel; and (2) the Galaxy DI Products, which are Galaxy smartphones manufactured abroad by SEC that incorporate the AMOLED DI Products. *Id.* at 157 & n.49, 168-69.  For each of these two categories of DI products, SDC pointed to different investments.  For the AMOLED DI Products, SDC relied on the alleged investments of its U.S.-based research and development laboratory, Samsung Display America Lab ("SDAL"), and those of a third-party contractor, Universal Display Corp. ("UDC").  *Id.* at 172-81.  For the Galaxy DI Products, SDC relied on the alleged investments of SEC's subsidiary, SEA.  *Id.* at 172.

With respect to the AMOLED DI Products, no party contested that it was appropriate to consider investments in the AMOLED DI Products as investments with respect to articles protected by the patent, and the ID did not separately analyze whether investments in the AMOLED DI Products should be included in the domestic industry.  *Id.* at 157 & n.49.  The ID therefore focused its analysis of whether a domestic industry existed based on the nature and extent of the asserted investments in the AMOLED DI Products by SDAL and UDC.  *Id.* at 172-181.

---

[11] As discussed below (*infra*), the Commission's determination that Complainant SDC failed to satisfy the economic prong of the domestic industry requirement is sufficient to find that SDC has failed to prove a violation of section 337.  Based on the dispositive nature of this finding, the Commission has determined to take no position on whether the ████████ ████████ products practice claim 5 of the '803 patent.  *See Beloit Corp.*, 742 F.2d at 1423.

PUBLIC VERSION

As to the claimed investments in the AMOLED DI Products, the ID determined that SDC failed to show that SDAL's alleged investments were qualitatively or quantitatively significant. *Id.* at 174-76.  The ID also determined that UDC's alleged investments included investments related to dopants that were not specifically developed for the AMOLED DI Products, which were not cognizable under *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879 (Fed. Cir. 2015).  *Id.* at 178-81.  Specifically, the ID found SDC's allocation methodology was flawed and unreliable because SDC's purchases of dopant materials from UDC are not all cognizable under *Lelo* and SDC failed to account for the non-cognizable portion of UDC's investments.  *Id.* at 179-81.  The ID further found that even if the UDC investments could be considered notwithstanding SDC's failure to properly allocate investments pursuant to *Lelo*, SDC failed to show that UDC's alleged investments were quantitatively significant based merely on the fact that ██████████████

██████████████████   *Id*. at 181.  SDC did not seek Commission review of the ID's findings with respect to SDAL and UDC, and accordingly, no longer relies on those investments in the AMOLED DI Products.[12]  CPet at 80.  SDC, therefore, has abandoned its claim that the economic prong is met based on the AMOLED DI Products.  19 C.F.R. § 21.0.43(b)(2).

As to the Galaxy DI Products, the ID determined that the relevant domestic industry does not include investments in the Galaxy DI Products, applying the *Magnetic Tape* analysis.  ID at 157-72.  On this basis, the ID found that SEA's alleged investments in the Galaxy DI Products were irrelevant to whether SDC satisfied the domestic industry requirement.  *Id.* at 172.  SDC

---

[12] To the extent SDC argues for the first time in its petition for review that SEA's investments may be combined with SDAL's and UDC's investments in the U.S to show significance, the Commission finds this new argument untimely.  *See* CPet at 79-80; RResp at 74-75; OResp at 25 n.11.

petitioned for Commission review of the ID's economic prong findings regarding the Galaxy DI Products. CPet at 27-80.

The Commission determined to review the ID's findings on domestic industry but did not request briefing from the parties on this issue.

### 1.    AMOLED DI Products

On review, the Commission affirms the ID's finding that SDC failed to show that SDAL's alleged investments with respect to the AMOLED DI Products were qualitatively or quantitatively significant. ID at 174-76. With respect to UDC's alleged investments, the Commission adopts the ID's finding that SDC's allocation methodology was flawed and unreliable because SDC's purchases of dopant materials from UDC are not all cognizable under *Lelo* and SDC failed to account for the non-cognizable portion of UDC's investments. *Id.* at 179-81. Because this finding is sufficient to conclude that the evidence does not show a domestic industry exists based on UDC's investments in the AMOLED DI Products, the Commission has determined to take no position on the significance of UDC's investments in the AMOLED DI Products even if they were creditable.[13] *Id.* at 181.

Accordingly, the Commission affirms with modifications the ID's finding that the evidence does not show a domestic industry exists based on SDAL's or UDC's investments in the AMOLED DI Products. As explained below, the Commission also affirms with modified

---

[13] Commissioner Kearns would affirm the ID's finding that Complainant has not demonstrated that UDC's investments are quantitatively significant based merely on the fact that ██████████████████████ ID at 181. In particular, Commissioner Kearns agrees with the ID's finding that Complainant's significance argument "is different than the scenario where all the investments in a domestic industry product occurred in the United States" and, thus, there are little to no foreign investments, but, here, the evidence demonstrates that "there are numerous other types of investments in the Domestic Industry Products that occur outside of the United States." *Id.* at 181 n.58.

reasoning the ID's finding that SDC failed to demonstrate the existence of a domestic industry under sections 337(a)(3)(A) or (B) with respect to the Galaxy DI Products.

### 2.    Galaxy DI Products

On review, the Commission affirms the ID's finding that SEA's investments in the Galaxy DI Products are not investments with respect to articles protected by the patents and thus the relevant domestic industry does not include investments in the Galaxy DI Products.   The Commission, however, does so based on modified reasoning as discussed below.

Since the passage of the Omnibus Trade and Competitiveness Act of 1988, Congress has required "significant investment in plant and equipment" under section 337(a)(3)(A) or "significant employment of labor or capital" under section 337(a)(3)(B) "with respect to the articles protected by the patent[.]"[14]  19 U.S.C. § 1337(a)(3); Pub. L. No. 100-418, § 1342, 102 Stat. 1107, 1212-13.  As the Supreme Court has observed, phrases like "with respect to" or "respecting" have a "broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject."  *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 717 (2018); *see United States* v. *Tohono O'odham Nation*, 563 U.S. 307, 312 (2011) ("in respect to" suggests a "broad" meaning); *see also Muldrow* v. *City of St. Louis*, 601 U.S. 346, 354-355 (2024) (treating "with respect to" to mean "pertain[ing] to" and equating it with the phrase "respecting").  That understanding of section 337(a)(3) is consistent with the preceding paragraph's use of the equally broad term "relating to" in describing the domestic industry requirement.  *See* 19 U.S.C. § 1337(a)(2) (requiring the existence or nascent existence of "an industry in the United States, *relating to* the articles protected by the patent" (emphasis added)).

---

[14] SDC did not allege a domestic industry exists under section 337(a)(3)(C) and, thus, prong (C) is not at issue in this investigation.

PUBLIC VERSION

Like "with respect to," "'relating to'" means "hav[ing] 'a connection with.'"  *Pugin* v. *Garland*, 599 U.S. 600, 607 (2023) (citation omitted); *see Lamar*, 584 U.S. at 717-718.  The Commission thus examines the domestic industry from the standpoint of whether the relevant investments "relat[e] to" or are "with respect to" the articles protected by the asserted patents.[15]

This inquiry is a fact-specific, case-by-case determination and depends upon how the complainant's domestic investments are connected to the articles that are protected by the asserted patents in the context of the realities of the marketplace.  To aid in that inquiry, in *Magnetic Tape*, the Commission laid out three factors to consider in determining whether the realities of the marketplace support finding that investments other than in the patented technology or patented article may be considered investments "with respect to articles protected by the patent":

> [W]hether the patented technology is sold as a separate entity or article of commerce; whether it is an essential component of the downstream product; and whether the domestic industry activities "have a direct relationship to exploitation of the patented technology."

*Certain Magnetic Tape Cartridges*, Inv. No. 337-TA-1058 ("*Magnetic Tape*"), Comm'n Op. at 48 (Apr. 9, 2019) (citing *Certain Video Game Systems & Wireless Controllers and Components Thereof*, Inv. No. 337-TA-770 ("*Video Game*"), Comm'n Op. at 66-67 (Oct. 28, 2013), *aff'd Creative Kingdoms, LLC. V. Int'l Trade Comm'n*, 588 Fed. Appx. 993 (2014)).

---

[15] In this regard, the ID suggested that a domestic industry should normally be "defined in terms of the patented article" and that only in "some exceptional circumstances" should the Commission recognize expenditures in downstream products.  ID at 157-158.  As discussed herein, however, the Commission has in some circumstances applied the realities of the marketplace to support considering investments other than those made directly in the patented technology or patented article.

PUBLIC VERSION

In appropriate circumstances, the Commission has applied the *Magnetic Tape* analysis (or a similar "realities of the marketplace" analysis) to include within the relevant "industry" investments in unpatented components or products which "relat[e] to" or are "with respect to" articles that are protected by the patents. For example, in *Air Mattress Systems,* the Commission considered complainant's investments in assembling the air mattress systems containing the patented air controllers because the air controllers were not articles of commerce unlike the air mattresses. *See Certain Air Mattress Sys., Components Thereof, & Methods of Using the Same*, Inv. No. 337-TA-971 ("*Air Mattress Systems*"), Comm'n Op., 2017 WL 11165550, at \*26-27 (June 20, 2017);[16] *see also Certain Subsea Telecomm. Sys. and Components Thereof*, Inv. No. 337-TA-1098, Comm'n Op., 2019 WL 9596565, at \*24-25 (Oct. 21, 2019) ("Recognizing the realities of the marketplace, there was no dispute that the alleged articles in commerce here are [complainant's] NuWave Optima systems that include the patented article, the AC400 module" and that "the whole NuWave Optima system is necessary to exploit the patented technology[.]"); *Magnetic Tape*, Comm'n Op. at 56 (determining the complainant may rely on its licensee's investments in patented magnetic tapes and unpatented proprietary magnetic tape drives because the drives were necessary to exploit the patented technology); *Video Game*, Comm'n Op. at 67-68 (determining the complainant could rely on investments in the patented interactive wand and certain unpatented components that were "central" to "exploit[ing] the technology of the claimed toy wands," but could not rely on investments in the attraction that were unrelated to wand interactivity); *Certain Sleep-Disordered Breathing Treatment Systems & Components Thereof*, Inv. No. 337-TA-890 ("*Sleep-Disordered Breathing*"), ID at 149-50 (Sept. 16, 2014),

---

[16] The Commission decision with respect to the '172 patent was later vacated on remand after the patent expired on appeal. *See Air Mattress Systems*, Comm'n Op., 2020 WL 861520, at \*1 (Feb. 19, 2020).

*unreviewed in relevant part*, Comm'n Op., 2015 WL 13817117, at *28 n.13 (Jan. 16, 2015)[17]

(determining the patented article, the H5i humidifier, is wholly dependent on an unpatented

component, the S9 flow generator, and the S9 flow generator was thus central to enabling the

complainant to exploit the patented technology of its humidifier).

Turning to the Galaxy DI Products, the Commission examines whether it is appropriate to

include domestic investments in the Galaxy DI Products made by SEA by applying the *Magnetic*

*Tape* analysis. There is no dispute that the technology of the Asserted Patents concerns

particular structural features of an OLED display panel. *See* ID at 157 n.49; CPHB[18] at 153

(stating "the AMOLED display" is "the patent-practicing article"). In the context of this

investigation, an AMOLED display panel is "a substrate bearing the pixel array itself, a touch

panel if the display is touch-enabled, and the circuits used to drive the pixels. This includes the

scan driver and pixel circuit at issue in this Investigation." RX-1084 (Pattison) at Q/A 42.[19]

---

[17] The Commission adopted the ALJ's domestic industry findings under section 337(a)(3)(A) and (B). 2015 WL 13817117, at *28 n.13. On appeal, the Commission moved for a remand in light of intervening domestic industry precedent in *Lelo*. On remand, the ALJ's remand ID ("RID") reversed his previous determination and found that a domestic industry did not exist because the claimed investments were not quantitatively "significant" under *Lelo*. *Sleep-Disordered Breathing*, ID on Remand (Nov. 10, 2016). The Commission determined to review the RID and declined to adopt certain findings in the RID. *See* Comm'n Notice at 3 (Jan. 12, 2017) (determining not to adopt the RID's statements that "the amount a complainant spends to purchase components manufactured in the United States is immaterial to the economic prong analysis," RID at 20-21, and that evidence of payments to domestic suppliers is "*per se* insufficient to include in the quantitative analysis," RID at 24).

[18] Complainant's Post-Hearing Initial Brief, EDIS Doc ID 828893 (Aug. 7, 2024).

[19] The asserted claim language and the patent specifications support finding the patented technologies are directed to the OLED display panels. *See Video Game*, Comm'n Op. at 60-63, 66-68 (finding the patent specification and claim language make clear that the "articles protected by the patent" is the toy wand). Here, the Asserted Patents describe the field of art as organic light emitting diode (OLED) displays and all disclosed embodiments are directed to particular structures within the OLED display. *See* JX-1 ('599 patent) at 1:15-21, 3:43-6:7; JX-3 ('803 patent) at 1:15-20, 1:54-3:10; JX-5 ('578 patent) at 1:20-24, 1:61-3:20. The asserted claims of

SDC manufactures these display panels in South Korea.  ID at 168 (citing CX-1636C-NCTPSC (Pyon) at Q/A 13).  SDC assembles each AMOLED display panel into an AMOLED display module in Vietnam and China.  *Id.* at 168-69 (citing CX-1636C-NCTPSC (Pyon) at Q/A 13).  Each display module includes "a number of other components that allow the panel to connect to and operate on the product for which it can be configured or for which it was designed, such as a mobile phone," including "a flex circuit, bonding ICs, software, a polarizer, optical clear adhesive, radiator film, and a back film."  RX-1084 (Pattison) at Q/A 42.  The parties do not dispute that it is appropriate for SDC to allege a domestic industry based on the AMOLED DI Products that incorporate the patented display panel.  ID at 157 & n.49.

The Commission has determined to affirm with modified reasoning the ID's determination that the realities of the marketplace do not warrant considering investments made in the Galaxy DI Products (*i.e.,* Galaxy smartphones) to be investments with respect to articles protected by the patents.  Inasmuch as the Commission finds that the relevant domestic industry products do not include the Galaxy DI Products, none of SEA's domestic activities related to the Galaxy DI Products are with respect to articles protected by the Asserted Patents.  Complainant SDC thus has failed to demonstrate that a domestic industry exists under sections 337(a)(3)(A) or (B) based on SEA's investments in the Galaxy DI Products.[20]

---

the '803 and '578 patents are directed to a pixel arrangement structure of an OLED display for displaying images by emitting light through a plurality of pixels.  JX-3 ('803 patent) at 10:54-55; JX-5 ('578 patent) at 9:5-54, 14:38-62; ID at 28-30, 67-70.  The asserted claims of the '599 patent are directed to pixel circuits in an AMOLED display "capable of detecting and self-compensating threshold voltage deviations."  JX-1 ('599 patent) at 3:44-47; ID at 108-110.  Thus, the patented technologies at issue in this investigation relate to OLED display panels.

[20] Because the ID found SEA's domestic activities related to the Galaxy DI Products are not creditable, the ID did not make findings regarding the proper allocation and significance of SEA's investments in the Galaxy DI Products.

PUBLIC VERSION

The ID analyzed and applied each of the *Magnetic Tape* factors to the facts of this case regarding the Galaxy DI Products and found the first factor (whether the patented technology is sold as a separate entity or article of commerce) is neutral, the second factor (whether it is an essential component of the downstream product) weighs in favor, and the third factor (whether the domestic industry activities have a direct relationship to exploitation of the patented technology) weighs against defining the domestic industry to include investments in the Galaxy DI Products. On review, the Commission finds the first and third factors weigh against broadening the domestic industry to include investments in the Galaxy DI Products and the second factor is at best neutral.

The **first factor** looks at "whether *the patented technology* is sold as a separate entity or article of commerce." *Magnetic Tape*, Comm'n Op. at 48 (emphasis added). There is no dispute that the display panel incorporating the pixel structure *is not* itself an article of commerce. Moreover, as noted above, the display panel is physically incorporated into an AMOLED display module, which in turn is incorporated into the Galaxy DI Products. The Commission agrees with the ID's findings that the evidence suggests that the AMOLED DI Products are separate articles of commerce. *See* ID at 160-161 (citing Tr. (Kim) at 565:16-19; Tr. (Cho) at 611:16-19, 613:5-8; CX-1603C (Sheppard Dep.) at 118:8-14, 176:16-22, 197:9-13; Tr. (Vander Veen) at 425:22-426:10; RX-1085C (Herrington) at Q/A 59); *see also* RX-1085C (Herrington) at Q/A 50, 52, 58; CX-1636C-NCT-PSC (Pyon) at Q/A 13, 15; CX-1245C (Bazelon) at Q/A 27; Order No. 43; CX-4035C.

SDC's Petition for Review argues that this factor favors inclusion of investments in the Galaxy DI Products because the "Galaxy DI Products provide the *only* avenue for the AMOLED DI Products to operate properly and exploit the benefits of the Asserted Patents." CPet at 39.

22

PUBLIC VERSION

The evidence of record shows, however, that the Galaxy DI Products are *not* "the only use for the displays embodying the patented inventions," even though the specific AMOLED DI Products are customized for the Galaxy DI Products. *Id.* at 2, 15. Such customization work is not unique between SDC and SEC.[21] SDC performs similar customization work for other OEM customers, such as ███████████. Tr. (Pyon) at 549:11-16 (██████████████ ███████████████████████████████████████), 553:18-554:10 (testifying SDC's ███████████████████████████████████████). In other words, even though a Galaxy DI Product uses a specific AMOLED DI Product, the patented technology of the display panel incorporated into the AMOLED display module is sold separately to other customers, like ███████████. RX-1085C (Herrington) at Q/A 50, 52, 56; CX-1245C (Bazelon) at Q/A 27.

SDC further argues that this factor favors including the Galaxy DI Products because the patented "inventions provide benefits especially valuable for mobile devices[.]" CPet at 16. Even if the patent specifications teach that the disclosed pixel arrangement is useful in smartphone applications, the claims of the '803 and '578 patents do not limit use of the pixel arrangement to any specific application. Tr. (Kymissis) 1056:19-1057:25 (testifying the asserted claims are not limited to any specific application and the specification of the pixel patents does not use the word "mobile"), 1122:23-1123:21. Indeed, the record shows that SDC's patented technologies are also used in consumer products other than smartphones and other industries including commercial, medical, and military markets. *See* ID at 161 (finding the "AMOLED DI

---

[21] Other than SDAL's and UDC's investments, which the Commission has determined to be insufficient to establish a domestic industry, SDC did not rely on any other investments related to the AMOLED DI Products or any specific investments made to customize its AMOLED DI Products for the Galaxy DI Products. And, as noted above, SDC has abandoned its claim to a domestic industry relating to the AMOLED DI Products.

PUBLIC VERSION

Products themselves are a product that can be exploited from an economic perspective, even apart from their use in a Galaxy phone"); CPet at 8; RResp at 8 ("SDC manufactures AMOLED displays for a wide variety of consumer electronics products, including TVs, notebooks, laptops, automotive displays, mobile phones, and VR products."); CX-1628C-NCT-PSC (Kymissis) Q/A 712, 722; *see also* RX-1085C (Herrington) Q/A 50; RX-0211C-NCT (Pyon Dep.) 38:6-21; RX-0213C (Song Dep.) at 24. Thus, the evidence shows that while the patented technology is useful for smartphones, the technology can also be used, and there is a market for, the patented technology in consumer products other than smartphones. Recognizing this distinction, Samsung created SDC to operate as a separate business from that of SEC and SEA. ID at 170-71 ("While the three companies all contain the name "Samsung," they are separate companies."); CX-1635C (Kim) Q/A 10-12 (testifying that SDC "was created to make a new company that would operate independently from SEC in the display business").

Despite finding the AMOLED DI Products incorporating the patented display panels are sold as separate articles of commerce, the ALJ found that "it is unclear if this factor weighs against crediting domestic investments in the Galaxy DI Products" because the Commission has credited investments in a downstream article even when a product is sold separately. ID at 161-62 (citing *Sleep-Disordered Breathing*, ID at 149) (finding the relevant domestic industry includes investments in both the patented humidifier and the unpatented flow generator even though the humidifier was sometimes sold separately)). The Commission, however, finds this factor weighs against considering investments in the Galaxy DI Products as investments with respect to articles protected by the patents. The fact that the patented technology is sold as a separate article of commerce suggests that investments in the downstream product may have less of a connection to the patented technology since the patented technology may be used separate

PUBLIC VERSION

and apart from the downstream article.  Indeed, the fact that the AMOLED DI Products incorporating the patented technology are sold separately from the downstream Galaxy DI Products tends to suggest that the degree of connection between the patented technology and the downstream Galaxy DI products is not as strong.  The ID seems to misunderstand the Commission's prior determinations, where despite finding the patented technology was sold as a separate article of commerce, the Commission nonetheless considered investments in a downstream or related product.   The fact that the Commission determined to consider investments in a downstream or related product despite the patented technology being sold as a separate article of commerce (one of the three factors the Commission considers under the *Magnetic Tape* factors) does not mean it is unclear how the factor weighs but simply reflects that the determination does not turn on this one factor but rather must be considered along with other factors and the relevant evidence.

For these reasons, the Commission finds that the first factor weighs against considering investments in the domestic industry to include SEA's investments in the Galaxy DI Products.

The **second factor** examines whether the evidence indicates that the patented technology is an essential component of the downstream product.  *Magnetic Tape*, Comm'n Op. at 48.  The ID found this factor favored including SEA's investments in the Galaxy DI Products because the AMOLED DI Products are "essential components" of the Galaxy DI Products and because the phones cannot function without the AMOLED DI Products.  *See, e.g.*, ID at 163 ("I find that the AMOLED DI Products are essential components of the Galaxy DI Products.");[22] CPet at 15 (asserting that the "AMOLED DI Products and Galaxy DI Products are '***completely customized***

---

[22] The ID's statement that the "fact that it is theoretically possible to modify a product so that it could work with other components does negate a finding that the existing component is essential," ID at 163, is a typographical error and should state "does not negate," instead.

*for*'—and exclusively sold for use with—each other"), 61 n.19 ("[T]he AMOLED DI Products need not be exclusively used by the Galaxy phones for them to be essential to those phones."). We disagree with the ID's assessment of this factor.

While SDC argues that the AMOLED DI Products are "nonfunctional" on their own and "must be physically connected to" the Galaxy DI Products "to operate properly," the focus of the second factor must remain on the patented technologies like the first factor. CPet. at 39. As discussed above, the patented technologies are undisputedly the patented pixel circuit and array structure in SDC's AMOLED display panels, which are incorporated into the AMOLED DI Products and then sold to SEC for incorporation into the Galaxy DI Products. Here, the evidence only shows that *a display* is essential to the Galaxy DI Products but that other kinds of unpatented displays, *e.g.,* LCD or OLED displays, can be used in place of SDC's patented displays. *See* ID at 163 (finding the evidence shows that "in theory, the Galaxy DI Products could be modified to operate with different displays") (citing Tr. (Bazelon) at 756:7-14; RX-1085C (Herrington) at Q/A 60; Tr. (Herrington) at 969:18-24; RX-0714C.23). Some modification may be needed to make those other displays work with the Galaxy DI Products, but modifications were also needed to accommodate SDC's AMOLED DI Products. Tr. (Pyon) at 549:11-16, 553:18-554:10.

In *Sleep-Disordered Breathing*, the complainant advocated for a "system" approach that considered all of its CPAP treatment products to be within the scope of the domestic industry, including its CPAP masks, flow generators, and humidifiers. The humidifiers were protected by one patent and the masks were protected by other patents, but none of the patents claimed a flow generator. However, the ALJ determined that the unpatented flow generator was "central to enabling [the complainant] to exploit the patented technology of the H5i humidifier because the

H5i humidifier is designed to work only with the S9 flow generator and "***cannot practice the***

***claims*** of the '453 Patent, ***without an S9 flow generator***."  *Sleep-Disordered Breathing*, ID at

147, 149 (emphasis added).  By contrast, for the patents that disclosed mask-related inventions,

the ALJ found that the masks were almost always purchased separately, the masks could be used

with other companies' flow generators and humidifiers, and the flow generator and humidifier

were not central to enabling the complainant to exploit the patented technology of its masks.  *Id.*

at 147.  The ALJ therefore credited investments related to the "co-pack" that included both the

humidifier and the flow generator for the patent that protected the humidifier but not for the

patents that protected the masks.  *Id.* at 150.

Distinctions in the marketplace between the masks and the humidifiers explain why,

under the facts of *Sleep-Disordered Breathing*, a domestic industry for patented masks *did not*

include investments in the humidifiers and flow generators while the domestic industry for the

patented humidifier *did* include investments in the flow generator.  In the former case, consumers

could still buy and use (that is, exploit) the masks in conjunction with other products available in

the marketplace even if the complainant had never invested in compatible humidifiers and flow

generators business.  In the latter case, stopping production of the compatible flow generator

meant eliminating any possible use of the humidifier by consumers.  Similarly, as discussed

above, the evidence shows that if the Galaxy DI Products were to discontinue, SDC could still

exploit its patented technologies by selling its AMOLED display modules to other

manufacturers.

In view of the above, the Commission finds the evidence regarding the second factor is

neutral at best, though the fact that the patented technology in particular is not essential to the

PUBLIC VERSION

Galaxy DI Products would tend to weigh against considering investments in the Galaxy DI Products as investments with respect to the articles protected by the patent.

The **third factor** looks at whether the domestic industry activities "have a direct relationship to exploitation of the patented technology." *Magnetic Tape,* Comm'n Op. at 48. Here, the Commission affirms the ID's finding that the domestic activities performed by SEA for the Galaxy DI Products are far removed from the patented technologies and, thus, this factor weighs against broadening the investments in the domestic industry to include the Galaxy DI Products.[23]  ID at 166-68 (finding SEA's activities do not have a direct relationship to the exploitation of the patented technology and are not necessary to ensure that the patented articles could be used by consumers).  There is no evidence that SEA significantly invests in the customization of SDC's display panel or the AMOLED DI Products to ensure compatibility with the Galaxy DI Products.  To the contrary, the majority of SEA's activities relate to ensuring the imported phones ███████████████.  *See id.* at 166-67; CPet at 46-54; Tr. (Vander Veen)[24] at 462:6-14 (testifying "there is additional work that is done, at least some of the [imported] phones, for example, flashing software, carrier specific software and so forth on those devices").  But whether a phone can ███████████ does not affect a consumer's ability to view information or use the display and does not relate to SEC's incorporation of the display into the phone.

---

[23] To the extent SDC's petition relies on arguments and evidence not set forth in its initial post-hearing brief to support its argument that SEA's activities related to the Galaxy DI Products are essential to the exploitation of the patented technologies or necessary to ensure SDC's patented displays could be used by consumers, the Commission finds those arguments and evidence untimely and waived.  *Compare* CPet at 46-56 *with* CPHB at 159-64; *see* OResp at 18-19 (citing Order No. 46 (Apr. 26, 2024) (arguing that SDC waived "any contentions that are not set forth in detail in the post-hearing initial brief" under Ground Rule 14.2)); RResp at 32-34.

[24] Dr. Vander Veen is SDC's economic expert on domestic industry.

SDC asserts that the ID erred in requiring that the specific SEA investments be necessary to exploit the patented technology in order to find that investments in the Galaxy DI Products are part of the domestic industry.  *See, e.g.*, CPet at 3, 28 (arguing that that "the ID legally erred by effectively requiring an additional showing that each investment, assessed one-by-one, was necessary either to exploit the patented technology or to otherwise ensure that the patented article could be used by consumers").  Contrary to SDC's assertion, Commission precedent supports looking at the relationship between domestic activities and investments and the articles protected by the patent to determine whether those investments qualify under section 337(a)(3)(A) and (B).

While the Commission has credited investments in articles that do not themselves practice an asserted patent when the realities of the marketplace supported such an approach, the Commission has, in prior investigations, excluded or otherwise limited consideration of investments in unprotected articles where the connection of those investments to the patented technology was too attenuated.  For example, in *Video Game*, the patented article was undisputedly "a 'toy wand' and not a toy wand in combination with an interactive play environment."  *Video Game*, Comm'n Op. at 63, 66.  The Commission allowed the complainant to include investments related to "the claimed wand, [the] electronic receivers within the MagiQuest effect, and the relevant main server software that coordinate these effects," *id*. at 73, "which [were] central to enabling [the complainant] to exploit the technology of the claimed toy wands," *id.* at 70, but not investments related to the entire MagiQuest attraction, such as the "physical space, design themes, physical props, other peripheral items, and sales and training staff," *id*. at 68, "which [were] far removed from the technology protected by the patent," *id.* at 67.  Here, the evidence shows that SEA's activities have no connection to the patented display technologies or AMOLED display modules that incorporate the display panels and SDC can and

does commercially exploit its patents in smartphones and consumer products other than the Galaxy DI Products.[25]

Contrary to SDC's assertion, the facts of *Magnetic Tape* are also distinguishable.  CPet at 30-32.  In *Magnetic Tape*, licensee IBM was not simply purchasing components from complainant Sony and incorporating them into a downstream product.  Rather, IBM practiced the asserted patents under authorization from Sony by developing its own proprietary storage format for its patent-protected 3592 tapes and its unprotected drives.  The Commission found that IBM's drive investments "ha[d] a direct relationship to exploitation of the patented technology" because Sony had "established that IBM's domestic 3592 drive development work is devoted to improving the interoperability of the 3592 tape media with drives."  *Magnetic Tape*, Comm'n Op. at 54-55.  Unlike IBM in *Magnetic Tape*, neither SEC nor SEA is separately practicing the Asserted Patents in the United States, and as discussed above, SEA's domestic activities for the Galaxy DI Products are far removed from the AMOLED display panels and the patented

---

[25] SDC also argues that it "has included only qualifying investments in the Galaxy DI Products—presenting the same categories of investments in Galaxy smartphones accepted by the Commission in previous investigations."  CPet at 45-46, 68-69 (citing *Certain Mobile Phones and Tablet Computers, All With Switchable Connectivity*, Inv. No. 337-TA-1301 ("*Mobile Phones*"); *Certain Electronic Computing Devices, and Components and Modules Thereof*, Inv. No. 337-TA-1387 ("*Electronic Computing Devices*")).  This case is not like these other investigations in which the Commission credited SEA's investments in Galaxy phones to establish a domestic industry.  The Commission terminated *Mobile Phones* based on a settlement agreement before the presiding ALJ issued an initial determination on violation of section 337.  The presiding ALJ in *Electronic Computing Devices* has not issued an initial determination on violation of section 337 and the technical prong of the domestic industry requirement is still at issue.  Moreover, unlike Respondents here, the respondents in *Mobile Phones* and *Electronic Computing Devices* stipulated that the domestic industry should include investments in various versions of the Galaxy mobile phones and did not contest complainant's motion for summary determination that it satisfied the economic prong of the domestic industry requirement based on licensee Samsung's domestic investments and activities.  However, as explained above, the record evidence in this investigation does not support finding the domestic industry should include investments in the Galaxy DI Products by SEA.

PUBLIC VERSION

technologies in the display's pixel arrangements and circuits.  ID at 166-68; Tr. (Herrington) at 979:12-980:18, 984:7-23; RX-1085C (Herrington) at Q/A 55, 76, 78, 81-82; Tr. (Vander Veen) at 424:12-425:5.  Thus, the Commission finds the third factor weighs against defining the domestic industry to include investments in the Galaxy DI Products.

In sum, applying the *Magnetic Tape* analysis, the Commission modifies the ID's analysis as discussed above and finds that the first and third factors weigh against broadening the domestic industry beyond investments in the AMOLED DI Products and the second factor is at best neutral.  Thus, the Commission affirms the ID's determination that the realities of the marketplace do not warrant extending the domestic industry to investments in the Galaxy DI Products.  Inasmuch as the Commission finds that the relevant domestic industry products do not include the Galaxy DI Products, none of SEA's domestic activities related to the Galaxy DI Products are with respect to articles protected by the Asserted Patents.  Complainant SDC thus has failed to demonstrate that a domestic industry exists under sections 337(a)(3)(A) or (B) based on SEA's investments in the Galaxy DI Products.

## IV.    CONCLUSION

The Commission has considered all of the other arguments by the parties and does not find them persuasive.  Therefore, for the reasons set forth herein, the Commission determines that Complainant has not established a violation of section 337 by Respondents with respect to the asserted claims of the '803, the '578, and the '599 patents.  Accordingly, the investigation is terminated with a finding of no violation of section 337.

**PUBLIC VERSION**

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: April 9, 2025